[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action for dissolution of marriage and other relief was referred to the Regional Family Trial Docket from the Judicial District of Stamford/Norwalk. Over a period of 4 days the parties tried to the court issues of custody, visitation, child support, alimony, health insurance, division of assets and liabilities, life insurance, as well as counsel fees. The court heard testimony from both parties, the Guardian AdLitem, the Family Relations counselor, teachers for the minor child, and other witnesses. Many exhibits were entered. The court has considered all the credible evidence presented to it and has considered the statutory criteria for the orders to be issued. These statutory criteria will not be restated here.
The court finds that it has jurisdiction over the marriage. One party has lived in the State of Connecticut continuously for more than one year prior to bringing this action. The parties were married on May 7, 1988, in Dobbs Ferry, New York. The following minor child has been born to the wife since the date of the marriage who is lawful issue of the marriage: Alexandra Mulvey ("Lexi"), born January 3, 1993. No other minor children have been born to the wife since the date of the marriage. Neither party has received assistance from the State of Connecticut. Connecticut is Lexi's "home state." The court finds that the marriage between the parties has broken down irretrievably and that there is no reasonable prospect for reconciliation.
The plaintiff, Michael Mulvey ("Mr. Mulvey"), is 41 years old. He has the equivalent of a high school education. He is trained as an engineer for air conditioning and heating maintenance. His family has a long history of leadership in the operating engineers union in New York City. As a result of these "connections," he procured a job in August 2000 as a building engineer at City College in New York working a night shift. He lives in Westport and takes the train to work. He grosses $1,175 per week and has the potential to increase this figure through overtime. There are significant fringe benefits with this job including a pension, full health insurance, an annuity, and a sick fund. It is unlikely that Mr. Mulvey would be able to acquire such a good job apart from his "contacts" CT Page 9457 in the operating engineers union in New York City.
Mr. Mulvey's work history as an operating engineer prior to obtaining his present job includes a disruption in 1992 as a result of a serious employment injury which resulted in a 25% permanent disability of his back. He received disability benefits of $350 per week until December, 1996. He made unsuccessful attempts to return to work until sometime in 1995 when he began playing in a band, working on a light show, and doing some day trading in the stock market. These endeavors produced yearly income of less than $10,000. Mr. Mulvey received a lump sum settlement of his claim regarding his injury in December, 1996. He received a net of $120,000. He paid $35,000 to Ms. Mulvey and used the rest of the money to supplement his income. He presently has no money in the bank and is in debt for nearly $80,000.
The defendant, Sally Mulvey ("Ms. Mulvey"), is 43 years old. She has a high school education plus a year of college and a year of secretarial training at Katherine Gibbs. At the time of the marriage she worked for a public relations firm in New York City earning approximately $30,000 per year. She was also involved in all aspects of the publication of a quarterly newspaper devoted to The Grateful Dead. This periodical,Dupree's Diamond News ("DDN"), eventually began to take more and more of her time. In December, 1989, she was terminated from her public relations job because she had been spending too much of her time on DDN while at work. DDN then became her full time occupation until November, 1996. Her responsibilities were numerous, impressive, and time consuming. However, it was mostly a labor of love because she was only able to charge $10 per hour for certain tasks plus expenses. Since leaving DDN, Ms. Mulvey has held a series of positions involving secretarial work, office administration, computers and graphics, and marketing. One of these jobs paid approximately $45,000 per year. But the others averaged $15 to $20 per hour. Ms. Mulvey's last job was as an office manager for an eye doctor earning approximately $25,000 per year. She is now unemployed. She has made a job search in the Fairfield County area but not in New Haven, Hartford, or New York City. She is a confident, organized, talented person with impressive experience in office administration. She is in debt for $147,720, of which, $134,280 represents loans from her brother and mother to cover litigation and living expenses.
The parties began married life in an apartment in Greenwich Village. They saved their money and bought a home in North Salem, New York in 1992. Lexi was born in 1993.
Differences arose in the marriage. They each gave reasons for these differences but there was no convincing evidence that either party was more at fault. In February, 1995, they decided it would be better if they CT Page 9458 separated. Mr. Mulvey moved to an apartment in New Paltz, New York, but continued to keep a residence in the basement of the marital home where he lived part-time. After about one year, Mr. Mulvey moved to Woodstock, New York. In February, 1997, the house was sold and the parties split the net proceeds of $55,000. Ms. Mulvey moved with.Lexi, age 4, to an apartment in Southport, Connecticut. During his time in New Paltz and Woodstock, Mr. Mulvey visited Lexi frequently, sometimes staying overnight with Ms. Mulvey. He took Lexi back to New Paltz or Woodstock for a couple of days each week. In 1999, Ms. Mulvey moved to an apartment in Westport. Mr. Mulvey moved to Westport in January, 2000. Lexi has had all of her schooling in the Westport public schools where she has just completed the 2nd grade. Both parties have been actively involved in Lexi's upbringing and schooling. They quibble over which one of them had been the "primary caretaker." The evidence supports a finding that each has taken a turn at being primary in terms of total time spent on Lexi's care. But, over the full 8 years of Lexi's life, Ms. Mulvey has consistently been the primary residential parent simply because Mr. Mulvey was the one who moved out of the house and who has been in the position of having to arrange contact with Lexi. The parties have cooperated splendidly in this regard and are to be commended for recognizing that Lexi needs to see them both as much as possible. It is unfortunate that the trial forced them into a position where they threw stones at each other on account of allegedly bad behavior in the past. This tactic was not worthy of either of them and proved not to be helpful in deciding the issues in the case.
Lexi is now 8 years old. She is described by everyone as a delightful child with lots of energy. She is doing well in school and has an active social life. She takes ballet and gymnastics, and plays soccer. She has a condition known as premature puberty which is being monitored by an endocrinologist. Both parents are actively involved in seeing that Lexi's diet is appropriate for her condition. Lexi has a loving relationship with both of her grandmothers. Her maternal grandmother lives six months in Florida and six months in Southbury, Connecticut. Lexi visits her regularly when she is in Connecticut. Lexi's paternal grandmother lives on Long Island. Lexi visits with her regularly.
The major issue in the case is whether Ms. Mulvey should be permitted to relocate with Lexi to the Nashville, Tennessee area. Ms. Mulvey's desire to make this move dates back to October, 1999, when she received an employment offer from a company in Nashville known as WebEBM, to work for them in an administrative capacity for $50,000 per year plus stock options. This offer resulted from Ms. Mulvey's longtime friendship with Joan Stadler and her husband, George (Mick) Stadler. Mick Stadler directs The Chancellor Fund, a part of the Vanderbilt University endowment, which develops and invests venture capital in promising "startup" companies. He CT Page 9459 is instrumental in the selection of the management teams for these companies. In this capacity, he arranged for the job offer to be extended to Ms. Mulvey. When Ms. Mulvey informed Mr. Mulvey that she intended to accept this job offer and to take Lexi with her, Mr. Mulvey commenced this dissolution action, and, after a hearing (Harrigan, J.), obtained a temporary order prohibiting Ms. Mulvey from relocating to Nashville with Lexi during the pendency of the case.
The original job offer from WebEBM has expired. She received a similar offer in November, 1999, from another Nashville-based company associated with Mr. Stadler, MXISystems, Inc. This offer has expired as well because Ms. Mulvey will not move to Nashville without Lexi. Mr. Stadler is still in a position to be able to influence the extension of job offers in the Nashville area which would pay in the $40,000-$50,000 range plus good benefits. Ms. Mulvey's plan is to move to a two-bedroom apartment outside of Nashville. These apartments rent for approximately $850-$950 per month. They are in gated communities with swimming pools. Ms. Mulvey's one-bedroom apartment in Westport rents for $1,200 per month. Ms. Mulvey would like Lexi to attend a Montessori school in the area which would cost $4,000 per year.
Ms. Mulvey argues that she will be able to provide Lexi with a better quality of life in Tennessee than she is able to do in Westport. She feels that Lexi is a "poor girl in a rich town." Her apartment is so small that Lexi is unable to have her own room. She and Lexi sleep in bunk beds in the one bedroom. Their personal possessions spill over into the living areas of the apartment. Lexi's living conditions cannot compare to those of her friends who live in large expensive private homes. With more income and a lower cost of living in Nashville, Ms. Mulvey feels that Lexi's best interests will be served.
Mr. Mulvey opposes the move to Nashville because he will lose the frequent contact which he has enjoyed with his daughter. His visitation would of necessity be reduced to summers, holidays and occasional long weekends. He feels that even if Lexi's quality of life would improve in certain respects, it would not offset the loss to Lexi of the benefits of having frequent regular contact with her father.
All parties agree that this case does not require imposition of the burden-shifting analysis set forth in the landmark Connecticut relocation case of Ireland v. Ireland, 246 Conn. 413 (1998). Rather, the court must be guided by the dictates of Section 46b-56 (b):
In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of CT Page 9460 sufficient age and capable of forming an intelligent preference . . .
In determining the best interests of Lexi, the court has considered all of the factors which have been recognized by the appellate courts of this state as being relevant to custody and visitation decisions. See,Rudolewicz v. Rudolewicz, 12 CLT 39 (Oct. 6, 1986). Most of these factors tend to balance each other out. The following two factors are an example. The Guardian Ad Litem, Attorney Mark Henderson, and the Family Relations counselor both recommended that Ms. Mulvey be given permission to relocate with Lexi. They feel that Ms. Mulvey's reasons for moving are legitimate and that the move will ultimately inure to Lexi's best interests. Their opinions are well reasoned and thoughtfully made. They weigh heavily in favor of the relocation.
On the other hand, Lexi's stated wishes point in the other direction. Lexi was initially excited about moving to Nashville. Mr. Mulvey gave her the impression that he would be moving with her and Ms. Mulvey. But, after about six months, Mr. Mulvey broke the news to Lexi that he would not be moving to Nashville. Since that time, Lexi has been cool toward the move. Her attorney argued her current position in opposition to the move. It is clear that Lexi's feelings have almost nothing to do with Westport or Nashville. All she wants is to have frequent regular contact with both of her parents. If that will not happen in Nashville, she opposes the move. Section 46b-56 (b)(1) of the General Statutes provides that in making any order with respect to custody or visitation the court is to give consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference. Although Lexi is only 8 years old, the court will give significant weight to her desire not to be separated from either one of her parents.
The motives of both parties are found to be pure. Ms. Mulvey truly believes that the proposed move would be in Lexi's best interests; Mr. Mulvey truly believes that it would not. In the final analysis, this is a very close case which can only be decided by trying to determine Lexi's best interests as objectively as possible.[1] Having weighed all of the relevant factors, it is found that it is in Lexi's best interests to have both of her parents living close enough to each other so that both can have frequent regular contact with her. This will only occur if Ms. Mulvey remains in Connecticut or the metropolitan New York area. Therefore, her request to move Lexi to Nashville will be denied. This decision will be disappointing for Ms. Mulvey. It would undoubtedly be better for her if she were able to move to Nashville and take one of the jobs which her "connections" could provide. The court is also mindful of her belief that to some extent Mr. Mulvey has gotten his life together and has become employed only because he thought he might lose regular contact with his daughter. There is some truth to this claim. The court CT Page 9461 draws the conclusion that Mr. Mulvey was shocked into maturity by Ms. Mulvey's plan to move to Nashville. Regardless of why it happened, Mr. Mulvey is employed at an excellent job with hours which fit perfectly for him to be a good father to Lexi and have a favorable impact upon her life. This is good for Lexi. It is clear that Mr. Mulvey needed his "connections" to obtain this job. It is also clear that Ms. Mulvey's talents, experience and personality will enable her to obtain rewarding employment without the necessity of "connections." With good research and planning she can also obtain appropriate affordable housing which will enable Lexi to continue to go to a good school and still maintain regular contact with her father.
The court issues the following orders:
1. The marriage of the parties is dissolved.
2. The parties shall have joint legal custody of the minor child, Lexi, and shall jointly make all major decisions affecting her health, education, and welfare. Day-to-day decisions shall be made by the parent having access to Lexi at the time such decision should reasonably be made.
3. Lexi shall reside with her mother, Ms. Mulvey, in Connecticut, or any other place in the metropolitan New York area, or any other place which is mutually agreeable to both parties. Mr. Mulvey shall have reasonable and liberal parenting time with Lexi. The court is confident that the parties can negotiate and cooperate to make the scheduling of this time as open and stress-free for Lexi as possible. However, at a minimum, this parenting time shall consist of the following:
During the school year, alternate weekends from after school on Friday until he brings Lexi to school on Monday morning; Tuesday from after school until Wednesday morning for those weeks before the weekends when Lexi shall be with her father; Thursday from after school until Friday morning for those weeks after the weekends when Lexi shall be with her mother;
During Lexi's summer vacation from school, each party shall be entitled to a two-week uninterrupted vacation with Lexi; the parties shall divide the balance of the summer equally;
The parties shall equally divide the minor child's February and April vacations;
The parties shall alternate legal and religious holidays. CT Page 9462
4. Mr. Mulvey shall pay child support to Ms. Mulvey in the amount of $143 per week which comports with the child support guidelines.
5. Neither party shall pay alimony.
6. Mr. Mulvey shall provide medical and dental insurance for Lexi as reasonably available through his employment. Ms. Mulvey shall pay the first $100 per year for health insurance not paid by insurance; thereafter, Mr. Mulvey shall pay 56% and Ms. Mulvey shall pay 44% of Lexi's health expenditures not paid by insurance.
7. Mr. Mulvey shall provide life insurance of $150,000 with Lexi named as beneficiary until she attains the age of 18 graduates from high school, whichever occurs last, but in no event past her 19th birthday. The court finds that this policy is currently in effect, which is sufficient evidence of insurability, and the premiums as disclosed on Mr. Mulvey's financial affidavit are reasonable and affordable by him.
8. Each party shall pay the debts shown on his or her financial affidavit and shall indemnify and hold the other harmless from the same.
9. Each party shall be entitled to the personal property in his or her possession, free and clear of any claim of the other.
10. Each party shall pay his or her own counsel fees.
11. Each party is responsible for payment of one-half of the fees and costs of the attorney for the minor child, Attorney Kieran J. Costello. After giving each party credit for previous payments, Mr. Mulvey owes $7,989.27 and Ms. Mulvey owes $3,300. These balances are to be paid within 60 days or in accordance with payment schedules agreeable to Attorney Costello.
12. Each party is responsible for payment of one-half of the fees and costs of the Guardian Ad Litem, Attorney Mark H. Henderson. After giving each party credit for previous payments, Mr. Mulvey owes $8,061.39, and Ms. Mulvey owes $7,281.39. These balances are to be paid within 60 days or in accordance with payment schedules agreeable to Attorney Henderson.
13. Any outstanding arrearage for pendente lite child support shall not merge in this judgment. The parties shall attempt to work out a stipulation as to the amount of the arrearage. If no stipulation can be reached within 15 days, the court shall be notified and, if necessary, will hold a hearing and determine the arrearage.
BY THE COURT, CT Page 9463
 _______________ JOHN W. PICKARD JUDGE OF THE SUPERIOR COURT